1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO, DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

| | |
|---|---|
| **SALOOJAS INC,** | : **Case Number 3:22-CV-02887-jsc** |
| **Plaintiff** | : **OPPOSITION TO DEFENDANT'S** |
| | : **MOTION TO DISMISS** |
| **vs.** | : |
| | : |
| **AETNA HEALTH OF CALIFORNIA, INC** | : U.S. Judge Jacqueline Scott Corley |
| | : Date: September 29. 2022 |
| **Defendant.** | : Time: 9:00 A.M. |
| _____ | : Location: Courtroom 8 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**

**TO DEFENDANT'S MOTION TO DISMISS**

_____

**LAW OFFICE OF MICHAEL LYNN GABRIEL**

**MICHAEL LYNN GABRIEL**

**CA Bar 86924**
**Attorney for Plaintiff**

**1563 Stevenson Blvd**

**Newark, CA 94560**

**650-888-9189**

**510-656-5700**

**aetal@earthlink.net**

**migabriel@saloojasinc.com**

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

PAGE NO  1  OF __

## <u>TABLE OF CONTENTS</u>

Page(s)

**INTRODUCTION** …………………………………………..6

I.   THE PLAINTIFF'S ACTION IS PROPER  UNDER
      BOTH THE CARES ACT AND THE FFRCA………………………… 12

II.   THE RIGHT TO SUE...........................................................................12

    1.  CASH PRICE HAS ALWAYS BEEN POSTED  …………………16

    2.  A DOCTOR IS SIMPLY IS NOT A LABORATORY AND   …………17
     IS NOT REQUIRED TO BE A LICENSED LABORATORY
     TO PRACTICE MEDICINE

    3  AN URGENT CARE DOES NOT HAVE TO BE A LAB TO   ………..18
     TAKE WALKIN PATIENTS FOR A MEDICAL EVALUATION

    4.  ALL COVID TESTS ARE CONDUCTED THROUGH CLIA  LABS…18

III.   ERISA CLAIMS HAVE BEEN PROPERLY PLED …………………………19

  A. EACH OF THE 1556 UNPAID AETNA CASES HAS AN ASSIGNMENT…19

  B.   SALOOJAS HAS EXHAUSTED ADMINISTRATIVE REMEDIES------- 19

IV.   PLAINTIFF PLEADS A VIABLE RICO CLAIM………………………... 23

  A.   Plaintiff Pleads a Viable Section 1962(c) Claim……………………… 25

  B.   Saloojas Sufficiently Pleads RICO Causation and Injury………….. 26

  C.   Plaintiff Sufficiently Pleads Mail and Wire Fraud………………..… 27

V. ERISA DOES NOT PREEMPT THE STATE CAUSES OF ACTION …… …. 28

  A.   PROMISSORY ESTOPPEL IS NOT PREEMPTED AND      ……………29
   WAS PROPERLY PLED

  B. INJUNCTIVE RELIEF CLAIM IS PROPERLY PLED  ……………...32
   AND NOT PREEMPTED

  C. CALIFORNIA'S UNLAWFUL, UNFAIR AND FRAUDULENT …………..33
   BUSINESS ACTS VIOLATIONS HAVE BEEN PLED AND ARE
   NOT PREEMPTED

**CONCLUSION**           …………………………………...35

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

# TABLE OF AUTHORITIES

Page(s)

## SUPREME COURT

*Bridge v Phoenix Bond & Indem. Co.* …………………………………....*27*

   *553 U.S. 639 661 (2008).*

**Cort v. Ash,**
  **422 U.S. 66 (1975)** …………………………………………………..**12**

**HEMI GROUP, LLC V. CITY OF NEW YORK,** ……………………………...**26**

  **559 U.S. 1 (2010)**

**HOLMES V. SECURITIES INVESTOR PROTECTION CORP** . ..………………*26*

503 U.S. 258,268 (1992))

*Sedima SPRL vs.Imrex CO.,* …………………………………**25,26**

*473 U.S. 479, 497-98 (1985)*

*SCHMUCK V. AETNA STATES,* …………………………………………...**27**

*489 U.S. 705, 712, 109 S.CT. 1443, L03 L.ED.2D 734 (1989)*

## NINTH CIRCUIT

**Saloojas, Inc vs Aetna Health of California, Inc** …………………………………....**6**
  case numbers 22-16034, 22-16035, 22-16036, 22-16037 and 22-16038.

*Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d at 594 …………………21
  (quoting **Amato v. Bernard,** 618 F.2d 559,567 (9th Cir. 1980)).

## OTHER FEDERAL CIRCUITS

***Bourgeois . Pension Plan for Employees of Santa Fe Int'l Corps,*** ……………………..19
  215 F 3d 475, 479 (5th Cir.2000)

*Molina-Aranda v. Black Magic Elllerprises, L.L.C.,* ……………………………**25**

  *983 F.3, 779, 784 (5th. Cir. 2020)*

*Panecasio v Uninsource* ……………………………………………………**21**

  532 F.3d 101, 114

*Cent. States, Southeast & Southll'est Areas Health & Welfare Fund* ........ *31*
*v. Health Special Risk, Inc., 756 F.3d 356,360 (5th Cir. 2014).*

*Plastic Surgery Cir., P.A. v Aetna Life Ins. Co.* ..................*30*
*967F 3d 218 (3rd Cir.2020)*

*DOE V. PRINCETON UNIV.,* .....................................................*31*
*790 F. APP'X 379, 386 (3D CIR. 2019))*

*SOUTHEAST & SOUTHLL'EST AREAS HEALTH &* .................................*32*
*WELFARE FUND V. HEALTH SPECIAL RISK, INC.,*
*756 F.3D 356,360 (5TH CIR. 2014)*

**FEDERAL DISTRICT COURTS**

*Breslin Realty Dev. Corp. v. Schackner,* ....................................................*27*

397 F. Supp. 2d 390, 399 (E.D.N.Y. 2005)

***RANDO V STANDARD INS. CO*** .................................................... .....*22*
182 F.3D 933 (10TH CIR 1999)

***LINDEMANN V MOBIL OIL CORP*** ........................................................ **22**
79 F.3D.647, 650 (7TH CIR 1996).

***Kesselman v. The Rawlings*** . ...................*14*
668 F. Supp. 2d at 609 *(quoting]ones v UNUM Life Ins. Co. of Am.,*
*223 F.3d 130, 140 (2d Cir. 2000))*

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.,* ..............................*22*
798 F.3d 125, 135 (2d Cir. 2015)

**CALIFORNIA COURTS**

***GRIMSHAW V. FORD MOTOR COMPANY*** ....................................................*23*
(119 Cal.App.3d 757, 174 Cal.Rptr. 348 .

**Statutes**

CMS ie Medicare Interim Final Rule IFC   3401 May 2020 ....................................*17*

ERISA PLAN. 29 U.S.C. § 1132(A) ..........................................................*21*

**RICO  18 U.S.C.  1962 (c)** ............................................................................**25**

RICO  18 U.S.C.  1964    ............................................................................25


**Other Authorities**

Journal of Urgent Care Medicine  March2, 2022 article ………………………       18
**S CODES (S9088 AND S9083) IN URGENT CARE**


*Pop's  Cones, Inc.  v. Resorts Intern. Hotel,*  …………………………………...*31*
307 N.J. Super. 461, 469 (N.J. Super. Ct. App. Div. 1998).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

Plaintiff Saloojas, Inc, dba AFC Urgent care of Newark, submits this Opposition and Memorandum of Law   to Defendant Aetna Healthcare of California's Motion to Dismiss.

3

4

### INTRODUCTION

5

6

7

288,000, 350,731, 1.2 million 445 . These are the dead. Most of the dead died from the contributing factor of COVI 19 without proper medical care because the insurance companies such as AETNA alone  ceased following the COVID CARES ACT .

8

9

10

11

12

13

14

15

It appears that rather than enforce a Trump program and in doing so save lives the Biden Administration has decided not to enforce the CARES ACT and thus give not any credit for saving lives to President Trump, the Biden Administration has not enforced the CARES ACT with the result that the number  of COVID Death have nearly  tripled. Furthermore to its shame, COVID 19 has morphed into another more deadly variant which now  is starting to sweep the country. On July 16 alone it was killing 445 a day  and still the CARES ACT is not being followed by insurance companies such as Aetna

16

17

18

19

In fact the Biden Administration has gone even further and  canceled the another Trump COVID program  the COVID Uninsured Program  as of March 22, 2022. This now leaves the poorest and most at risk Americans those without insurance coverage at all without no access or ability  to see a medical doctor for COVID testing

20

21

22

23

24

25

26

27

All of this has been highlighted when President Biden who had a booster shot for COVID  announced on July 21, 2022 there he now has COVID . The White House reported that President Biden had gotten the latest shot after clearance from his doctor.  It speaks volumes that the Precedent of the United States can see a doctor as part of his COVID testing but that same right  is denied to citizens who wish to see  their out of network doctor for COVID testing because the Biden Administration is not enforcing CARES act and Uninsured COVID program.

28

The numbers above :

1.      350,731 is the CDC number of  COVID deaths    in 2020 under President Trump  and after the CARES Act passed.

2.      The 1.2 million total US death figure so far is nearly triple the COVID Tests following the Biden Administration decision no to enforce the Cares Act.

3.      The 445 figure  the number of daily deaths of COVID as July 16, 2022 by NBC   https://www.nbcnews.com/health/coronavirus

| ↑ 40.6%<br>**Cases**, two-week change<br>136,627<br>Average daily COVID cases<br>89,822,059<br>Total confirmed cases | ↑      36.1%<br>**Deaths**, two-week change<br>445<br>Average daily COVID deaths<br>1,026,647<br>Total confirmed deaths |
|---|---|

4       The number of 288,000, the number of German deaths by Nazis of their own people. https://scottmanning.com/content/nazi-body-count/

### NO OTHER DEVELOPED COUNTRY ON THIS PLANET IS RESTRICTING AND LIMITING COVID MEDICAL COVERAGE TO ITS CITIZENS AS THE AETNA IS DOING IN NOT ENFORCING THE CARES ACT

One more number for the court to bear in mind IS  ZERO, 0,  nada, nothing, zilch, **This is the amount of money it would actually cost the Biden Administration to enforce the CARES Act.**  The Biden Administration would not even send a letter to the insurance companies informing them that they are in violation of the CARES Act and face suit by the administration as well by the  unpaid medical providers for the full posted prices for their rendered COVID testing services and most telling they could be sued by the insured and families of the deceased insured who died because they were denied the proper COVID medical care that was to be provided under the CARES ACT. Such damages by Aetna's insured include the wrongful deaths  resulting  from the lack of COVID  medical testing

services that occurred  because they could not afford to pay for doctor visits which were supposed to been paid by their insurance  companies without deductibles or copays being assessed. This is the proof of the Biden Administration's lack of enforcement is for political grounds and so the number of COVID deaths attributable to the insurance companies  of American citizens, exceeds exponentially the NAZIs murders of their own citizens.

What is the CARES ACT? It consists of just 2 sections and  simply requires insurance companies to pay the full posted prices of out of network medical providers who rendered COVID testing services. That is it.

Dr Parmjit Singh is not a Democrat or Republican  he is just an urgent care doctor doing business as the Plaintiff Saloojas, inc a California medical corporation.    In 2020, President Trump passed the COVID CARES ACT to protect Americans. The CARES Act requires  insurance companies to fully pay for COVID testing without  deductibles or copays of out of network providers according to their posted prices

After the  2020 election Biden Administration stopped enforcing the CARES ACT and after that AETNA  stopped paying  the full posted prices of ut of network providers for the medical care being given. This lack of enforcement had a deadly effect in the United States.  With over 1 million dead in a nation of 331 million per 2020 census, virtually  every American now knows or has heard of a person who has died of COVID.    In comparison, COVID deaths have tripled from less than 360000 under Trump to now nearly 1.2 million. No other developed county has shown such absolute indifference to the care of its citizens. Since Biden would not do it, Plaintifff has  filed 6 early identical class actions lawsuits against the major insurance companies including AETNA to enforce the CARES Act and also have filed a writ of certiorai to the US Supreme Court to settle the issue of enforcement of the CARES ACT .

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

PAGE NO   8  OF   35

Dr Singh  has posted his prices for his COVID medical testing and evaluation services and until Jan 2021 when President Biden took office, the  Insurance companies Aetna, Anthem, Blue Cross, Blue Shield and Cigna  followed the CARES Act and fully paid the posted prices to out of network providers

Dr Singh in conformity with the CARES ACT posted his charges appropriate COVID CPT Codes

| CARES ACT POSTED PRICES FOR COVID SERVICES | | |
|---|---|---|
| **SERVICE RENDERED** | **BILLING CODE FOR SERVICE** | **CASH PRICE OF SERVICE** |
| **New Patient, Doctor Visit** | **CODE 99203** | **$383  SINCE January 2/2019** |
| **Established Patient, Doctor visit Code** | **CODE 99214** | **$385 SINCE January 2/2019** |
| **Services at URGENT CARE Center POS 20** | **CODE S9088** | **$364 SINCE January 2/2019** |
| **Procedure of Collection of COVID Nose swab** | **CODE G2023** | **$90 SINCE May 20, 2020** |
| **COVID Protective equipment PPE,** | **CODE  99072** | **$85 SINCE May 20, 2020** |
| | | |

The five small claims complaints which were removed by Aetna to federal Court show what has happened after the Biden Administration took office where it now refuses to fully pay for the same COVID testing services and now assesses co-pays and deductibles against its insured in violations of the CARES Act

Since President Biden assumed office, neither the plaintiff, nor any other out of network provider in the United States, has been fully paid  for their rendered COVID testing services as required under the CARES ACT.  For the plaintiff, it has not been fully paid in over 32,000 cases by all of the insurance  companies of which as of May 15, 2002 included

1556  unpaid cases  from Aetna specifically. In most of these 32000 cases, the insureds were improperly and illegally told that they were responsible  for the unpaid balances of the bill in violations of the CARES Act as being an illegal deductible or co-pay.

Once in Federal court,   Aetna then made a motion to dismiss claiming that the CARES Act can only be enforced by the Biden Administration and did not carry a private right of action. This Court agreed and granted the motion to dismiss. Plaintiff has appealed the dismissal of the five cases, the notice of appeal for this case and the other 4 small claims cases have been filed in the cases before the Northern District of California:

1. 22-16034  for DC case 3:22-cv-01696-JSC

2. 22-16035  for DC Case : 3:22-cv-01702-JSC

3. 22-16036  for D.C. case : 3:22-cv-01703-JSC

4. 22-16037  for D.C. No.: 3:22-cv-01704-JSC

5. 22-16038  for D.C. No.: 3:22-cv-01706-JSC

The driving issue behind the need for the  writ is to settle  the conflict of jurisdictions and the enforcement of the CARES ACT duing this pandemic to achieve Cngress's intent during this pandemic.

To this mixture of states is added the other 3 states having motions to dismiss pending and needing Supreme Court resolution to settle the issue of who can enforce the Cares Act

1.    New  Jersey   **OPEN MRI AND IMAGING OF RP VESTIBULAR DIAGNOSTICS, P.A., vs. CIGNA HEALTH AND LIFE INSURANCE COMPANY,**   Case

No:  2:20-CV-10345-KMSK

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

1

2

 2. Minnesota **GS LABS, LLC,** **v.** **MEDICA INSURANCE**

**COMPANY,** Case Number: No.: 21-cv-2400

 3. Washington **PREMERA BLUE CROSS vs/ GS LABS, LLC,** Case No.

2:21-cv-01399-LK

 Added to all of the above is the growing emergency situation and resurgence of the

pandemic for which the CARES ACT is front and center in the COVID treatment. During

2020 when Trump was president the insurance companies followed the Cares act and

350,381 people died of COVID according to the CDC figures. After Jan 2021 when Biden

took office insurance companies stopped following the CARES Act with the result that the

number of COVID Deaths have nearly tripled to well over 1 million. The difference is

attributable to insurance companies not paying for proper medical testing services in

violation of the cares act. The insurance companies are not obeying the law because the

Biden Administration has chosen not to enforce the CARES ACT when it would cost the

government nothing to enforce the CARES act because doing so would give credit to Trump.

 **No other developed country on this planet is restricting and limiting medical**

**coverage to its citizens as the Biden Administration is doing in not enforcing the Cares**

**Act basically on political grounds**

.......This is a real emergency situation for which the Supreme Court is needed immediately to

settle the law on a national COVID medical policy so that people do not die unnecessarily.

For the same reason it will be a basis of writ of mandate to be filed next week in the

Northern District Court of California for the Biden administration to start enforcement of the

CARES Act. It is important that the CARES ACT be enforced without delay be it by the

Biden Administration or by the affected through a private right of action, the pandemic

requires he enforcement.

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   THE PLAINTIFF'S ACTION IS PROPER UNDER BOTH THE

## CARES ACT AND FFRCA

### A. THE RIGHT TO SUE

The determination of a private right to sue under the CARES Act is now before  the US the Ninth Circuit Court of Appeal.  In addition a Petition for a writ of certiorai called the Writ Against Death will be filed shortly (the petitoon was prepared for filign but unexpected delays in the Appendix preparation has delayed the filing). The Wri is called the Writ Against Death that is what it is intended to do has been filed with the US Supreme Court. It is intended to stop the politicization of the CARES Act and get it enforced as Congress intended.

Saloojas seeks the both Supreme Court and Court of Appeal review to clarify whether the Supeme Court's ruling in *Cort v. Ash*, **422 U.S. 66 (1975)** when applied to this fact pattern results in an implied private right of action for the enforcement of the CARES Act being found.

Saloojas has  appealed this Court's dismissal of the 5 Small Claims cases to the Ninth Circuit in actions :*Saloojas, Inc vs Aetna Health of California, Inc* with case numbers  22-16034,  22-16035, 22-16036, 22-16037 and  22-16038.

Since the Court ruled on the CARES ACT private right of action issue in the 5 other small claims AETNA cases, there has been a substantial changes in facts. There has been a resurgence in the pandemic with a more deadly strain. A few months ago it was thought  that COVID may be dying out. Now that is not the case. Last week President Biden the most protected person in the nation has came down with the very deadly M5A variant. Even after having all of his boosters.  What is telling is that the White House press stated when President Biden had his video taped booster that he did do after after seeing his doctor. That medical visit is the heart of the CARES ACT and which is the most important service not being paid by AETNA.

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

PAGE NO  12  OF   35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The CARES Act was intended to give the same opportunity to receive the same COVID TESTING services as available to the President of the Aetna States. Now that is not begin done and people are dying because of it. That is the purpose of the lawsuits and petition for the writ: to have the CARES ACT enforced independent of political motivations to stop it

As pointed out in the writ petition less than 360000 died of Covid when President Trump' Cares act was being enforced. Immediately thereafter the Biden Administration stopped the enforcement of the CARES Act and since then Covid Deaths have tripled to over 1.1 million.

Aetna is one of the insurance companies responsible for increase of COVID deaths. Below is one telling example of Aetna scheme not to follow the CARES Acct. This is shown by the compilation of 2 EOB from AETNA for the same patient for two visits. It shows on its face that for this patient on Dec 8, 2020 President Trump's Administration, Aetna paid the nearlt the full posted Covid prices for the rendered services. Then 5  weeks later on Jan 16, 2021 when the patient came back for a repeat followup exam,  then Aetna paid only 242.50 for the same services.

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS
PAGE NO  13  OF   35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS
PAGE NO  14  OF   34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This is not an isolated case. Attached as Exhibit 1 are another ten (10) more 2020 EOBS from AETNA showing full payment of the CARES ACT billing during the Trump Administration. What changed? What was the reason for so abruptly at the end on 2020 for AETNA suddenly not paying the full posted prices for COVID testing services owed the CARES ACT?  The only factual change was the 2020 Election of President  Biden and his administration's subsequent non enforcement of the CARES ACT, seemingly for the basest  political reason ie not wanting to give President Trump credit for the lives saved under the CARES Act. The non-enforcement gave all insurance companies the green light not to follow the CARES ACT.

   The result of AETNA not following the CARES Act- deaths. Deaths many of which are avoidable and caused by the basest of reasons profits. AETNA is keeping its costs down by not paying for the required covid medical services to out of network providers. This is an orchestrate program of economic extortion to force out of network providers to become in network providers in order to be paid. It is also intended to force  out of network providers to stop taking Aetna patients because they would know they are not going to be paid if they do so.

   The result is that people are not getting proper medial care.  More than 1 out 5  Americans go to out of network providers    https://www.ehealthinsurance.com/resources/affordable-care-act/using-out-of-network-doctors-cost-money . The main reason for going to an out of network provider is that the patient wants the better care that is provided than is given by an HMO or PPO even though they have to pay for the care personally.

        In the case of COVID,  going to an out of network doctor can truly be a life saver. Aetna's in network doctors  do not take emergency or walkin patients. AETNA does not pay their doctors more for taking walkins and thus discourages the practice, Dr. Singh however does take walkins. To do so Dr. Singh charges under S9088 an additional fee for walkin patients because of the extra burden it causes on scheduling. In short it costs more to treat in time , effort

and anxiety walkin patients which AETNA's in network doctors do not do imply because they are not paid more for doing so.

### 1.  THE CASH PRICES  HAVE ALWAYS BEEN POSTED

AETNA's  claims it does not know the posted prices for the covid serveries. That is an unbelievable statement. The cash prices are posted at saloojasinc.com/about and copied below:

**" NO REASON TO BE SCARED**

YOU ARE IN THE HANDS OF EXPERIENCED MEDICAL PROVIDERS
We will gently swab the nose, in all the right places per CDC guidelines.
We pack your **SPECIAL NASAL SWAB in Cold Container**
and send to CLIA Registered lab
For RT-PCR test We partner with Quest and LabCorp
Rapid NAAT test is done Inhouse in 1 hour
*  *  *  *  *
**Corona Testing service on demand when you need it**
*  *  *  *  *
**COST OF COVID TEST / VACCINE**
**NO OUT OF POCKET COST**
This is mandated by the Federal and State Emergency laws in place
We bill the Insurance company for
Covid test
using CPT E&M Codes approved by AMA
1) New Patient, Scheduled Doctor Visit Code 99203, E&M $ 383 ^
OR
2) New Patient, Scheduled Doctor Visit Code 99204, E&M $578 ^
OR
\OR
4) Established Patient, Scheduled Doctor visit Code 99214, E&M $385 ^
and
5) Services at URGENT CARE Center POS 20, S9088 $364 ^
for WALK-IN clients for extra special handling
and
6) Procedure of Collection of Covid Nose swab, G2023/99211 $90
and
7) Covid Protective equipment PPE, 99072 $85
and
8) The National Lab will Bill directly to the Insurance
RT PCR done at CLIA Certified Lab Quest/ Labcorp /Basis
or

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS
PAGE NO  16  OF   34

We Bill Rapid NAAT test Abbott at CLIA waved lab, 87635 $199

or

8) We bill Vaccine code as per CMS guidelines $ 0.01

and

Vaccine administration $67

The posting speaks for itself.     **"NO OUT OF POCKET COST** This is mandated by the Federal and State Emergency laws in place We bill the Insurance company for Covid  test using CPT E&M Codes approved by AMA"

That is a statement of the law. AETNA ,as well as every other  insurance company, is required to pay the full cash posted price under section 3202 (b) of the CARES ACT:

> "If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.

Since the insurance company has to fully pay the bill, Plaintiff does not bill the patient but instead bills the insurance company directly, If any patients wanted to pay the bill directly, the patient can do so and then seek reimbursement from the insurance company.

Not surprising among the over 50000 covid patients the Saloojas had not one who elected to pay the cash price and then seek reimbursement from the insurance company. Why would anyone do so? There is no benefit to be derived in paying the bill for the insurance company.

## 2.   A DOCTOR IS SIMPLY IS NOT A LABORATORY AND IS NOT REQUIRED TO BE A LICENSED LABORATORY TO PRACTICE MEDICINE

Aetna has confused a lab with a medical office. A lab cannot engage in the practice of medicine. The code 99203 is for the doctor visit for the covid medical evaluation. A medical visit is not a lab test. After a medical visit the doctor may sign an order for lab test to be done but that is done as a doctor not a lab.

The CMS ie Medicare made it clear in Interim Final Rule IFC   3401 May 2020   page 81-82 stated that it wants as part of a COVID testing service that there should be a  doctor visit

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS
PAGE NO  17  OF   34

and that while not requiring a medical visit for the first test it absolutely does require one for the second and subsequent tests.

"Whereas we are committed to reducing impediments to access to Covid-a9 testing and the other related tests identified in the May 8th COVID 19 IFC, we believe that is it contrary to the public interest to allow open ended coverage of COVID-19 testing without an order from a physician, practitioner or other health care professional.   ***

We believe that this approach will provide sufficient notice for laboratories to setup the systems and processes to require an order beyond the first test."

The argument that Saloojas should be a CLIA provider in order to conduct and be paid for the medical visit is nonsensical.

### 3. AN URGENT CARE DOES NOT HAVE TO BE A LAB TO TAKE WALKIN PATIENTS FOR A MEDICAL EVALUATION

The Journal of Urgent Care Medicine  March 2, 2022 article **S CODES (S9088 AND S9083) IN URGENT CARE** covers the history of the Code S9088.   The S9088 walkin code was actually created by Blue Cross and Blue Shield and by the Center of  Medicaid and medicare Services (CMS)

"Q.  What is an S code

A. S codes are a set of Healthcare Common Procedure Coding System (HCPCS) codes that were originally requested by Blue Cross/Blue Shield. The codes are listed by the Centers for Medicaid & Medicare Services (CMS), but they *are never for use on claims filed to Medicare*.

Q.   Does anyone besides Blue Cross and Blue Shield pay on S codes?

A.   Yes, many payors and agencies (including managed care organizations [MCOs] and state workers compensation boards) have found these codes useful for defining specific services that are neither recognized nor reimbursed by Medicare or Medicaid.

### S9088: Services Provided in an Urgent Care Center

Q.   What is S9088?

A.   Some payors recognize that the services rendered in true urgent care centers cost significantly more than the services that are rendered in traditional primary care physician offices. Thus, this is an "add-on" code to allow urgent care centers to be reimbursed for at least a portion of this increased cost of rendering service.

**Q.   Who can use this code?**

A.   Any urgent care center can use this code. An urgent care center, as defined by UCA, is an ambulatory medical clinic (with x-ray and CLIA-waved lab testing) that is open to the public for walk-in, unscheduled visits during all open hours and offering significant extended hours, which may include evenings, weekends, and holidays. Some payors may have more specific requirements, including ACLS certified personnel, crash cart with specific supplies, on-site inspections, and others. The State of Colorado has made specific, fairly stringent regulations for an urgent care center to qualify to bill this code for workers compensation cases, and other states may follow suit.

**Q**.   **When does S9088 apply?**

A.   Your urgent care center can use this code for all unscheduled, walk-in visits to the urgent care center.

**Q**.   **Can I add this code to codes for other services?**

A.   Yes. This is an "add-on" code. Unless restricted by contract or regulations,   you should add this code to any and all other billed codes. "

When the Code S9088 is charged to AETNA   for a walkin fee by its insured. If Aetna's insured makes an appointment   charge is not made. This charge has nothing to do with the office being or not being a lab but everything to do with it being a medical office performing medical services and evaluations which are not lab tests for which a CLIA certificate is needed

### 4.   ALL  COVID TESTS ARE CONDUCTED THROUGH CLIA  LABS

Most of the lab tests were not in any way conducted by the Saloojas. For these tests all Saloojas did was on to collect the swabs and had them delivered to the labs at the request of the patients but the test and billing of the tests were conducted by an independent lab.  As stated on its web site under the independent CLIA which ran the tests is Quest/Labcorp

"8) The National Lab will Bill directly to the Insurance
RT PCR done at CLIA Certified Lab Quest/ Labcorp /Basis"

In a few instance to date, 18 to exact, AETNA has  received a bill from Saloojas  for covid tests which it conducted  and for which Aetna paid a portion of those 18 bills. Those tests were conducted by Travato Medical Group, a licensed  CLIA lab located in the same building as Saloojas. Travato is a CLIA lab owned and operated by Dr. Singh. The Travato's CLIA licensing  is attached as Exhibit 2.

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS
PAGE NO  19  OF   34

In those few cases where Saloojas billed AETNA for a covid test, Dr Singh the medical director and owner of Saloojas, Inc  issued the order for the test and the patient had it done by Travato and the bill went through Saloojas.  So the test was performed by a licensed CLIA lab and as such Aetna owes for each of those few tests.

### III. ERISA CLAIMS HAVE BEEN PROPERLY PLED

### A. EACH OF THE 1556 UNPAID AETNA CASES HAS  AN ASSIGNMENT

Every patient of Saloojas executes an assignment attached herewith as as Exhibit 4. That includes the patients whose EOBS were included in the complaint.   The language is unambiguous There is no confusion.

"Doctor Consulting Visa Charges are Billed to the insurance company with copays/coinsurance or charged to me as cash/credit and is a proper charge for medical consult service and is not refundable except as   ***

Exception: if it is determined by the doctor that the Corona test is Medically Necessary then the NO OUT OF POCKET COST rules will apply which means that per CMS Guidelines insurance copays and out of pocket costs will be refunded for patients with insurance and cash pay charges refunded for persons paying cash/ credit card. For medically necessary Corona testing, office will bill insurance or CMS for visit and **testinmgh by CLIA certified lab**."

This is an assignment giving Saloojas the authorization to present the bill for the rendered Covid services. Saloojas is bot bulling the patient and says in on its web site. It is billing the Insurance company solely and the patient knows that it will not get a bill. So the patent is consenting to the assignment

### B.   SALOOJAS HAS EXHAUSTED ADMINISTRATIVE REMEDIES

It is odd that AETNA is claiming that Plaintiff has not exhausted administrative remedies. Plaintiff has gone over board in appealing the denial of the claims and the court has seen the examples of this in the prior small claim cases.

In the 1556  unpaid cases Aetna issued an EOB and of those unpaid claims  1146 of those cases were appealed and  AETNA rejected them either with  no reason stated for rejections or stating that they were filed too late. After consistent rejections, Plaintiff realized it

was begin played by AETNA who had no intention to properly process the appeals. The Plaintiff then started the filing of the small claims actions which were removed to this Court and the subject of the first motion of the dismiss by this Court

In each small claims case 1696, 1702, 1703, 1704 and 1706, which AETNA removed to this Court in the previous action there was attached complete record of the appeal: the AETNA EOB, Saloojas' appeal letter and the AETNA's final rejection of the Appeal, attached as Exhibit  5 is is the small claims case 1696.  This was the same scenario  repeated in all of the appeals conducted before Saloojas gave up and started suing.

It appears that Attorneys attorneys do not communicate well to each other. As further example of Saloojas going beyond the appeal process, AETNA asked the records of 40 patients whose names were provided after AETNA paid some of the claims.  Attached hereto as Exhibit 6 is the compete information provided to Aetna for the first 2 patients. The information for the other 38 patients was provided later and filed a box weighing 38 pounds.

plaintiff can overcome the administrative exhaustion requirement through a "clear and positive showing that seeking review by [the defendant] would be futile.'" *Kesselman v. The Rawlings*  668 F. Supp. 2d at 609. The purpose of the exhaustion requirement is to "help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d at 594 (quoting *Amato v. Bernard,* 618 F.2d 559,567 (9th Cir. 1980)). Where a plaintiff's participation in a formal administrative process is futile, the purposes are "no longer served," and "a court will release the claimant from the requirement." *Id.*

A participant or beneficiary may bring an ERISA claim to seek recovery of benefits under his or her ERISA plan. 29 U.S.C. § 1132(a). Claims where a plaintiff has neither identified the plan at issue nor the plan language violated have been dismissed. See, e.g.,

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

PAGE NO  21  OF   34

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.,* 798 F.3d 125, 135 (2d Cir. 2015) (affirming the dismissal of ERISA claims where the plaintiff failed to allege, inter alia, "her patients' plans or the terms of their plans"). Here, however, the reimbursement obligation derives from the Coronavirus Legislation, which effectively modified the terms of ERISA plans to provide SARS-CoV-2 tests at no cost to a patient. Thus, the relevant plans could not have precluded Aetna's obligation to reimburse COVID- 19 diagnostic testing in accordance with federal law. Under the circumstances of this case, Plaintiffs failure to plead the specific plan language or identify the individual assignor-beneficiaries does not warrant dismissal.

In addition to the above, attached as Exhibit 7 are two of AETNA's  appeal responses for the representative claims included the complaint.  The rejection letters on their face show the pointless nature of the appeal because ONE states that the appeal was late when as pointed out in all of Saloojas' appeal letters, the deadline for filing a Covid ERISA claim was extended to 60 days after the end of the pandemic which has not yet occurred. Such a denial is on its face illegal by AETNA and shows futility in pursuing the administrative appeals. The second one we sent the appeal back using Aetna's Complaint and Appeal Form as requested but AETNA never responded back on the appeal and for the third, Aetna said plaintiff would be informed on the appeal within 30 days and to this date no decision on the appeal was given by Aetna so it is deemed denied,

### Futility of Administrative Appeals Process

 A claimant is excused from demonstrating exhaustion if she can show that pursuit of administrative remedies would have been futile, ***Bourgeois . Pension Plan for Employees of Santa Fe Int'l Corps,*** 215 F 3d 475, 479 (5th Cir.2000) To qualify for the futility exception to the exhaustion requirement, the claimant must show a " certainty of an adverse decision" ***Rando v Standard Ins. Co*** 182 F.3d 933 (10th Cir 1999), ***Lindemann v Mobil Oil Corp*** 79

F.3d.647, 650 (7th Cir 1996). The focus of futility is on bias in the review process not based on company official reviews, ***Bourgeois Pension Plan for Employees of Santa Fe Int'l Corps, supra.***

   For AETNA to claiming before this Court that the ERISA appeals were not exhausted is ridiculous. The Court need only look to small claims cases removed to see for itself that procedure was followed until it became clear AETNA was not acting in good faith

### IV. PLAINTIFF PLEADS A VIABLE RICO CLAIM

   The predicate act for which the RICO cause if action is essentially death. The denial of proper medical care through its intentional scheme to violate of the CARES ACT  will be shown to be the operative cause of tens of thousands of deaths.

   The gist of this case is not new. It is corporate  greed to make profits at any costs in a scheme regardless of the numbers of innocent dead that leaves in its wake.  The best example of that before this case is ***Grimshaw v. Ford Motor Company*** (119 Cal.App.3d 757, 174 Cal.Rptr. 348 . This is the case and scenario that will be argued before the US Supreme Court in the petition for writ and the Court of Appeal to show how the desire for profits have left a string of dead across the country.   Just as Ford refused to correct a cheap safety problem on its Pinto car to save money. Aetna has violated the CARES ACT in its scheme to prevent their insureds from getting the medical care they were entitled. In both cases the results were deaths and the reason to make money because it was felt that the number of payoffs in the suits for damages would be less than the cost to obey the law.

   In ***Grimsha***w, the courts found that, while "the standard of care for engineers in the industry" after a failed safety test was to "redesign and retest," and although fixes were inexpensive, "Ford produced and sold the Pinto to the public without doing anything to remedy the defects." Design changes that would have enhanced the fuel system at very little cost included:

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS
PAGE NO  23  OF   34

- Longitudinal side members: $2.40 ea.
- Cross members: $1.80 ea.
- Shock absorbing "flak suit" for the fuel tank: $4.00
- Tank within a tank and placement of the tank over the rear axle: $5.08 to $5.79
- Nylon bladder within the tank: $5.25 to $8.00
- Placement of the tank over the rear axle with a protective barrier: $9.95
- Substitution of rear axle with a smooth differential housing: $2.10
- Protective shield between differential housing and fuel tank: $2.35
- Improvement and reinforcement of rear bumper: $2.60
- Additional 8 inches (200 mm) crush space: $6.40

Equipping the car with a reinforced rear structure, smooth axle, improved bumper and additional crush space at a total cost of $15.30 would have made the fuel tank safe in a 34 to 38-mile-per-hour rear-end collision by a vehicle the size of the Ford Galaxie. If, in addition to the foregoing, a bladder or tank within a tank were used or if the tank were protected with a shield, it would have been safe in a 40 to 45-mile-per-hour rear impact. If the tank had been located over the rear axle, it would have been safe in a rear impact at 50 miles per hour or more.

Ford's conduct was so egregious it was found liable for punitive damages. The court:

finding in punitive damages award was upheld on appeal:

"There was ample evidence to support a finding of malice and Ford's responsibility for malice. Through the results of the crash tests Ford knew that the Pinto's fuel tank and rear structure would expose consumers to serious injury or death in a 20- to 30-mile-per-hour collision. There was evidence that Ford could have corrected the hazardous design defects at minimal cost but decided to defer correction of the shortcomings by engaging in a cost-benefit analysis balancing human lives and limbs against corporate profits. Ford's institutional mentality was shown to be one of callous indifference to public safety. There was substantial evidence that Ford's conduct constituted "conscious disregard" of the probability of injury to members of the consuming public...There is substantial evidence that management was aware of the crash tests showing the vulnerability of the Pinto's fuel tank to rupture at low speed rear impacts with consequent significant risk of injury or death of the occupants by fire. There was testimony from several sources that the test results were forwarded up the chain of command;...While much of the evidence was necessarily circumstantial, there was substantial evidence from which the jury could reasonably find that Ford's management decided to proceed with the production of the Pinto with knowledge of test results revealing design defects which rendered the fuel tank extremely vulnerable on rear impact at low speeds and endangered the safety and lives of the occupants. Such conduct constitutes corporate malice."

Aetna has done virtually the same thing only with medical coverage. Aetna to avoid paying for proper medical care for its insured decided not to follow the law and not to obey the CARES ACT. It rejected proper claims for payment in a scheme to force out of network providers from

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

treating their insureds. This is an ongoing scheme of economic extortion. Knowledge of the CARES ACT is shown by the Plaintiff's Appeal letter provided to the court as exhibit 3 which was also attached to the small claims cases in the previous action and provided again in Exhibit 5. The appeal prevents a good faith defense of mistake because after being giving the appeal letter in Plaintiff's appeals, AETNA continued and still continues not to follow the CARES Act and the harm continues to wit: avoidable Covid death,

Plaintiff more than sufficiently pleads its RICO claim against Aetna in Count III. "RICO is read broadly" and "liberally construed to effectuate its purposes" Sedima SPRL v. Inrex Co., 479, 497-98 (1985). Moreover , the Supreme Court has "repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe. *Bridge v Phoenix Bond & Indem. Co*. 553 U.S. 639 661 (2008). Aetna's conduct fits squarely within the text and intended scope of the statute.

### A.   Plaintiff Pleads a Viable Section 1962(c) Claim

"RICO makes it 'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of rackeetering activity" 18 U.S.C. § 1 962(c); *Molina-Aranda v. Black Magic Elllerprises, L.L.C.*, 983 F.3, 779, 784 (5th. Cir. 2020) RICO allows'"[a]ny person injured in his business or"property by reason of a violation of section 1962 to bring a civil suit for treble damages. " 18 U.S.C. § 1964(c). To state a claim under § 1962(c), a plaintiff must adequately plead that the defendant engaged in '(l) conduct (2) of an enterprise (3) through a pattern (4) of rackeetering activity. '" *Sedima, S.P.R.L. v. lmrex Co.,* 473 U.S. 479,496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).Given the allegations against Aetna as detailed in Plaintiff's Complaint and the gravity of this RICO cause of action, Aetna says very little in its

Motions to Dismiss about the viability of this claim. Aetna's arguments with respect to Plaintiff's RICO claim are as follows: (i) Plaintiff did not plausibly allege that the RICO violations predicate act; and (ii) Plaintiff did not present any factual allegations that tie mail or wire fraud to its alleged damage

### B.   Saloojas Sufficiently Pleads RICO Causation and Injury

In a claim under Section 1962(c), a RICO plaintiff must allege that a RICO predicate offense "'not only was the 'but for' cause of his injury, but was the proximate cause as well." *Hemi Group, LLC v. City of New York*, 559 U.S. I, 9 (2010) (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258,268 (1992)).Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. However, the plaintiff need not be the direct target of the fraud or other racketeering. *St. Luke's Health Network, Inc. v. Lancaster General Hospital*, No. 19–3340, *2020* WL 4197525, (3d Cir. July 22, 2020)

Here, Plaintiff alleges an injury to its business or prope1iy. Aetna attempts to paint Plaintiff's allegations as nothing more than a recitation of a history of Aetna's handling of claims; however, under Plaintiff's actual claims, Plaintiff properly alleges that Aetna's misconduct has resulted in thousands of Plaintiff's Covid Testing claims being denied and thousands of others being underpaid despite the requirements of the FFCRA and the CARES Act. These denials and underpayments alone allege an "actual monetary loss" or concrete financial loss" sufficient to allege a RICO injury. *Maio v. Aetna. Inc.*, 221 F.3d 472,483 (3d. Cir. 2000). Additionally, as detailed in the Complaint, Plaintiff spent considerable time and resources identifying Aetna's fraudulent conduct and taking action against Aetna. "[C]osts associated with remediating or taking legal action against RICO conduct amount to an 'out-of-pocket loss' that is actionable under RICO." *Desmond v.*

*Siegel,* No. CIV. 10-5562 DRD, 2012 WL 3228681, (D.NJ. Aug. 6.2012). As to causation, Plaintiff has directly and sufficiently linked Aetna's predicate acts to Plaintiffs injuries.

### C. Plaintiff Sufficiently Pleads Mail and Wire Fraud

A mail fraud violation requires proof of two elements: (1) a scheme to defraud, and (2) any "mailing that is incident to an essential part of the scheme ... even if the mailing itself contain[s] no false information." *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639,647, 128 S. Ct. 213 l, 2138, 170 L. Ed. *2d* IO12 (2008)(quoting *Schmuck v. Aetna States,* 489 U.S. 705, 712, 109 S.Ct. 1443, l03 L.Ed.2d 734 (1989)).Importantly, it is not necessary to allege that the defendant "personally used the mails or wires or even knew of the specific mailings that were made; it is sufficient that a defendant 'causes' the use of the mails or wires." *Breslin Realty Dev. Corp. v. Schackner,* 397 F. Supp. 2d 390, 399 (E.D.N.Y. 2005). Moreover, mailings "need not be an essential element of the scheme" to defraud, but are sufficient so long as they are "incident to an essential part of the scheme." *Schmuck,* 489 U.S. at 713

The Complaint alleges in detail the schemes, programs, and processes utilized by Aetna to violate the CARES Act, and the use of mails and wires in furtherance of such fraud. Plaintiff went so far as even attaching specific examples of the use mails and wires to send denial of appeals to further bolster its allegations against Aetna. In any event, Aetna's schemes and fraudulent practices are described clearly and logically, and Plaintiff has pied that Aetna made false statements in furtherance of them. As detailed in the Complaint, below are examples of fraudulent schemes furthered by Aetna through the use mails and wires that are the proximate causes of Plaintiffs damages.

- **Aetna's Meritless Adjudication of Covid Testing Claims:** As covered in th3 Complaint, Aetna unlawfully and inconsistently adjudicated Covid Testing

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS

claims. Aetna has utilized letters, electronic remittance advices, explanation of benefits, and other documents to fraudulently represent to Plaintiff, its members, to the Employer Plans, and other self-funded health plans that it administers that it was adjudicating Covid Testing claims in accordance with applicable laws, when in reality it was intentionally violating the CARES Act with the full knowledge that its insureds were not getting the proper medical coverage as required under the CARES Act and ERISA

These above referenced examples and the supporting documentation included with each of the examples is more than sufficient to allege mail and wire fraud as they were used "to perpetuate an ongoing scheme." *United States v Surtain*, 519.App 266, 285(5th cir 2013) (holding that a letter mailed by an insurer informing the defendant-insured that their policy was defective was sufficient to sustain a mail fraud claim against the defendant because a "would be scammer must expect that as a normal part of the claims  process- or , stated differently as a step in  [the] plot- he will be required to prove his claim's legitimacy") The motion to dismiss the RICO claim should be denied.

## V.  ERISA DOES NOT PREEMPT THE STATE CAUSES OF ACTION

Aetna assets that the state causes of action are preempted by ERISA. That might be the case if the state causes of actions did not have an independent existence beyond the enforcement of payment of ERISA claims but they do so it does not. *Aesthetic & Reconstructive Breast Cntr,* LLC 367 F.Supp. 8. The state causes of actions are independent of ERISA although complementary,

State common law claims which "seek to rectify a wrongful denial of benefits under ERISA-regulated plans, and do not seek attempt to remedy any violation of a legal duty independent of ERISA" are preempted, *Panecasio v Uninsource* 532 F.3d 101, 114

First the claims derive from the CARES ACT . It was the CARES which requires insurance companies to pay out of network providers for their covid rendered testing

services not ERISA. It is true ERISA handles claims to made under a policy in these obligation to pay for the services also derive from  the CARES ACT not ERISA.

This Court in the earlier Aetna case ruled that the CARES ACT carries no private right of action. That issue is before both the Court of Appeal as well as the United States Supreme Court because of the conflict in jurisdictions over that very point of law.

Also next week, plaintiff will be filing a Petition for writ of mandate  ordering the Biden Administration to enforce the CARES ACT.  This writ is following  both this Court's and the Connecticut court's reasoning that the Biden Administration is solely responsible to enforce the CARES ACT. In that case, the Biden Administration given the emergency nature of the pandemic should do so.

It seems an argument can be made that the reason the Biden Administration has not enforced the CARES Act is because it is obvious to it that private right of action does in fact exist and it is leaving to out of network providers to enforce the act.  The petition writ of mandate would have been filed before or this opposition but in truth there just was not enough time to do this Opposition the Writ to the Supreme Court, the Notices of Appeal and petition for the writ of mandate all at the same time. But it will be filed and a copy provided to the court when filed, for the court's information.

The state causes of action are premised on the redressing the damages caused by Aetna not following the CARES ACT.  The complaint cannot bring back the dead killed by Aetna's actions but it can seek to stop actions causing those deaths from continuing holding AETNA responsible for its actions.

## A.   PROMISSORY ESTOPPEL IS NOT PREEMPTED AND WAS PROPERLY PLED

An  implied  contract  exists  under  the  CARES  Act  between  all  insurance companies And out of network providers. The issue of enforcement is now before the Court of Appeal and soon before the Supreme Court through a writ of certiorai. Because  the  implied  contract  sets  fo1th  payment  terms  pursuant  to  the  CARES  Act,

there is no need to look to the terms of any ERISA-governed plan for the basis of Aetna's payment obligation.

Thus, as in *Plastic Surgery Cir., P.A. v Aetna Life Ins. Co. 967F 3d 218 (3rd Cir.2020)* Plaintiff "has plausibly pleaded breach of contract and promissory estoppel claims that do not 'relate to' ERISA plans under either of the two definitions:

(1) the causes of action do not require impermissible 'reference to' ERISA plans because hey are not claims for benefits due under an ERISA plan and are not otherwise premised on ERISA plans; and

(2) the claims do not have a 'connection with' ERISA plans because they do not arise out of a relationship ERISA intended to govern, because they do not 'interfere[] with nationally uniform plan administration,' and because holding these claims preempted would undermine ERISA's stated purpose." 967 F.3d at 230.

In *Plastic Surgery Center,* the Third Circuit, in viewing the allegations in the light most favorable to the plaintiff and drawing all reasonable inferences in the plaintiffs favor, concluded that the claims as pied were not for benefits due under the plans or otherwise predicated on the plan or plan administration. *Id.* at 233. The court instead concluded that "Aetna's oral offers or oral promises (as the case may be) rather than the terms of the plan ... define the scope of Aetna's duty." *Id.* Here, the CARES Act-not the terns of any plan document-define the scope of Aetna's duty. Likewise, Saloojas's recovery depends entirely on the CARES Act's mandate that Aetna pay the "negotiated rate" or the "cash price" Saloojas listed on its public website-requirements that are independent of any plan document. *See* CARES Act, § 3202(a)(2). Accordingly, Saloojas' contract claim and promissory estoppel claim are not preempted by ERISA.

Even if there were not a private right of action, Aetna through its actions of fully paying for the rendered Covid services prior to 2021 created a situation where Saloojas believed through Aetan's conduct that it would continue to pay for the rendered services as required by law. As a result Saloojas continued to provide COVID Medical and testing services to Aetna's insureds instead of suing earlier for the nonpayments.

Courts have stated that the "essential justification for the promissory estoppel doctrine is to avoid the substantial hardship or injustice which would result if such a promise were not enforced." ***Pop's Cones, Inc. v. Resorts Intern. Hotel,*** **307 N.J. Super. 461, 469 (N.J. Super. Ct. App. Div. 1998).** Courts have thus "relax[ed] the strict requirement of 'a clear and definite promise' in making a *prima facie* case of promissory estoppel" in favor of "a more equitable analysis designed to avoid injustice." *Id.* At 463, 472.

Here, Saloojas has far more than a mere "general expectation" of a benefit,. *See* Mot. at In ***Doe v. Princeton Univ., 790 F. App'x 379, 386 (3d Cir. 2019)),*** the court rejected the plaintiffs promissory estoppel claim based on an allegation that "Princeton promised, in return for Doe's acceptance of admission and tuition, that Princeton would not tolerate and, [Doe] would not suffer sexual assault by another student, unfair procedures, or an arbitrary termination of his enrollment." *Doe,* 790 F. App'x at 386 (citations omitted). The court held that the plaintiff had not alleged a "clear and definite promise" because the promises alleged "represent the 'general expectation[s]' a student has when attending a university." *Id.* Here, in contrast, Saloojas has more than "general expectations" of payment-based on Aetna's prior payment practices, in which it had paid per the terms of the CARES Act and the FFCRA-it was reasonable for Saloojas to rely on the belief that Aetna would continue to obey the law and would continue to pay. It is disingenuous for Aetna to contend that

payment and duration terms were "unspecified" when the payment methodology is mandated by Congress during the public health emergency.

Saloojas detrimentally relied on the conduct of Aetna which was an implied promise to comply with the law and fully pay for the covid rendered testing services under the CARES ACT. This obligation survives the issue of a private right of action be3cuase it is conduct designed to reach a desired result: treatment of its insured and if done full payment for the services will be made. This is detrimental reliance in its purest form which is independent to the CARES's Act's right to sue. At this stage of the litigation, it is premature for the Court to dismiss Saloojas' promissory estoppel claim, and Aetna's motion to dismiss the promissory estoppel claim should be denied.

## B.  INJUNCTIVE RELIEF CLAIM IS PROPERLY PLED AND NOT PREEMPTED

Plaintiffs' underlying causes of action are sufficiently pled to sustain a claim for declaratory relief, as described above, and such action is appropriate as actions based in equity. Here, in addition to seeking damages to related to Aetna's denials and underpayments of Covid Testing claims, Plaintiff is also seeking relief from for Aetna's failure to provide a full and fair review and for its racketeering activities. Claims seeking more than just money damages indicate that the relief sought is more likely to be equitable relief. ***Cent. States, Southeast & Southll'est Areas Health & Welfare Fund v. Health Special Risk, Inc., 756 F.3d 356,360 (5th Cir. 2014)***. Clearly these causes of action request more than just money damages and as such, Plaintiffs are entitled to equitable relief. ***Cent. States, Southeast & Southll'est Areas Health & Welfare Fund v. Health Special Risk, Inc., supra*** Thus, Plaintiff's claims for equitable relief, based on the viable claims described above and throughout the entirety of the Complaint, should not be dismissed.

### C.  CALIFORNIA'S UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS ACTS VIOLATIONS HAVE BEEN PLED AND ARE NOT PREEMPTED

Since when has it been right just and proper for a business to engage in practices which in essence kill people while also being  in violation of the law?

Irrespective of whether the CARES Act can be enforced, Aetna made an intentional business  decision not to follow it. It is the ramifications of that decision that has  resulted in millions of Americans not receiving the medical care which was guaranteed to them  under the CARES ACT.

The number of death and contracted Covid cases will be ascertained by discovery  but who besides Aetna and it fellow insurance companies  can say that :

1. not obeying the CARES Act and not paying out of network providers for their covid rendered medical services   to their insured with the foreseen effect of driving the out of network providers  out of business is right just and proper?

2. That assessing insureds for copays and deductibles for their covid medical etsting and shots with the effect of getting them not to use out of network providers when those copays and deductibles  are illegal to access under the CARES Act?

3. By it actions above forcing its insureds not to see medical doctors for their covid testing and while saving the insurance companies fortunes exposing their insureds to covid in unacceptable manners?

Basically,  and these questions  will be asked before the Jury: "What benefit to AETNA's insured is derived  from them not seeing a medical doctor, as President Biden did for the order get their medical test when it would cost them nothing? In that case who benefits besides AETNA?"

This is a modern version of  the Ford pinto Case. This is, as it is still ongoing, an intentional act , scheme and program  by AETNA not to enforce the CARES ACT and to save money by doing so on the pain and in many cases deaths of its insured. The harm that is caused by AETNA is readily foreseeable. Who cannot see the benefit in seeing a doctor for

COVID exam when it s free? In converse, Who cannot see the harm when the insured is prevented from seeing a doctor by illegal copays and deductibles  which force the insured to chose between providing for their families or risking COVID by not seeing a doctor.  The exact choice that Congress intend stop citizens having to make.  It is a choice that never should have been put before AETNA's insured because to get to that point AETNA had to institute a plan, program, scheme to violate  Federal law and not enforce the CARES ACT.

The unfair business act in plaintiff's complaint is is AETNA's willingness to let people die just to make an extra  buck by curtailing access to the very medical care which was guaranteed by Congress in  the CARES ACT.

The actions by Aetna meet every definition of coercion , malice  and gross indifference to life. Just as in **Grimshaw,** supra, the judgment should be the same regarding Aetna's scheme of death.

Replacing Ford with  Aetna in the **Grimshaw** finding, one has no difficulty seeing its pattern of illegal activity

"There was ample evidence to support a finding of malice and  ~~Ford's~~ {Aetna's] responsibility for malice. *****There was evidence that  ~~Ford~~ [Aetna]could have ~~corrected the hazardous design defects~~ {followed the CARES ACT} at minimal cost but decided to  ~~defer correction of the shortcomings~~ ignore the CARES ACT by engaging in a cost-benefit analysis balancing human lives and limbs against corporate profits. ~~Ford's~~ Aetna's institutional mentality was shown to be one of callous indifference to public safety. There was substantial evidence that ~~Ford's~~ {Aetna's) conduct constituted "conscious disregard" of the probability of injury to members of the consuming public…

California's Unfair Business Act claim is independent from the ERISA claim. The claim is not for the payment of the ERISA benefits, it is for indemnification and redress for the harm caused by the outrageous and intentional actions of AETNA. For that reason, it is not exempted by ERISA as it is a stand alone state cause of action

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS
PAGE NO  34  OF   34

1
2
                              **CONCLUSION**
3
     Based upon the foregoing,  it should be found that an implied Congressional private right
4
of   actions  exists  under  the  CARES  Act.  This private right of action gives to all out of
5
network providers  who render Covid Testing Services, such as the Plaintiff, the ability to sue
6
in their own right to redress  of any violation of the CARES Act.
7
8
      In addition,  the  court  should  that  find  that  valid  causes of action have  beep  plead  for
9
ERISA violation, as well as the state causes of action for promissory estoppel, injunctive relief
10
and violation of California's Unlawful, Unfair Business Practice  Act.
11
12
      Finally,  the  court  shroud  find  that the class action allegations are proper and the class
13
certified. If there motion is granted, then  leave to amend should be granted because all of the
14
issues  cited  can  be  cured  by  amendement  even  the  class  aacyion  by  simply  staign  a
15
clarification that the action arises udner both ERISA and CARES ACTs.
16
17
                              `            Respectfully submitted
18
19       Dated  July 29 , 2022                Law Office of Michael Lynn Gabriel
20
                                             _/s/ Michael Lynn Gabriel_____
21                                           Attorney For Plaintiff
22
23
24
25
26
27
28

TITLE OF DOCUMENT:  OPPOSITION TO MOTION TO DISMISS